UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
AT PIKEVILLE

<u>ELECTRONICALLY FILED</u>

| | | |
|---|---|---|
| ROBYN BENTLEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:15-CV-00097-ART-EBA |
| | ) | |
| HIGHLANDS HOSPITAL CORP., ET AL. | ) | |
| | ) | |
| Defendants. | ) | |

---

**MOTION FOR SUMMARY JUDGMENT OF THOMAS B. STYER, M.D.
AND WHITAKER NATIONAL CORPORATION
ON STATUTE OF LIMITATIONS GROUNDS**

---

Come the Defendants, Thomas B. Styer, M.D. and Whitaker National Corporation, and move this Court for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56(b). Plaintiff's claims against these Defendants were filed after the expiration of the statute of limitations and are therefore time-barred.

## I.    STATEMENT OF FACTS

### A.    Ms. Bentley's Medical Course: July 29-30, 2013

On July 29, 2013, thirty-five year old Robyn Bentley presented to the Emergency Department at Paul B. Hall Regional Medical Center at 2:16 a.m. with complaints of back pain for the past two nights. (*See* Exhibit 1: Robyn Bentley, Vol. I, at 117.) She also reported numbness and tingling in her legs and difficulty with urination. (*Id.* at 112.)

Ms. Bentley was evaluated by emergency medicine physician Dr. Thomas Styer, who ordered a urinalysis with post-void catheterization, lab work, and a CT scan of her lumbar spine. (*Id*. at 115, 123, 132.) Dr. Styer informed Ms. Bentley that the CT scan did not reveal any emergent findings in her low back, and he discharged her shortly after 5:00 a.m. with pain medication and instructions to follow up with her family physician. (*Id*. at 130, 131, 138.)

Ms. Bentley presented to her family physician, Dr. Blake Burchett, around 9:00 or 9:30 a.m. that same morning. (*Id*. at 150.) At Dr. Burchett's office, Ms. Bentley reported increasing numbness and tingling in her legs with an inability to move her left foot. (*Id*. at 151.) Dr. Burchett evaluated her and admitted her directly to Highlands Regional Medical Center for an immediate MRI. (*Id*. at 153.)

Ms. Bentley underwent an MRI of the lumbar spine at Highlands Regional Medical Center that afternoon. (*Id*. at 161.) While at Highlands Regional, Ms. Bentley's loss of movement continued to progress up her left leg and into her right foot, and her numbness and tingling progressed into her abdomen and back. (*See* Exhibit 2: Robyn Bentley, Vol. II, at 18-21.)

That evening, Ms. Bentley was transferred from HRMC to Central Baptist Hospital in Lexington by ambulance. (*Id*. at 35.) During the ambulance ride to Lexington, she informed the EMT, as well as her mother by phone, that her symptoms were progressing up into her diaphragm and causing some difficulty breathing. (*Id*. at 38.)

Upon her arrival at Central Baptist, Ms. Bentley was unable to move her legs. (*Id*. at 52.) She reported difficulty breathing to someone in the ER. (*Id*. at 38-39.) Ms. Bentley

underwent an MRI of her entire spine which she was told showed inflammation around her spinal cord. (*Id.* at 47.)

Ms. Bentley was administered IV steroids (Prednisone) after receiving the results of her spine MRI. (*Id.* at 47.) After she received the IV steroids, Ms. Bentley noticed that her symptoms did not progress anymore. (*Id.* at 50.) She distinctly recalls that the progression of symptoms stopped when she received Prednisone. (*Id.* at 51.)

### B.    Ms. Bentley's Initial Hospitalizations: August - September 2013

Ms. Bentley remained hospitalized at Central Baptist Hospital from July 29, 2013 through August 9, 2013. Her treating neurologist, Dr. Timothy Coleman, mentioned transverse myelitis to her and also felt that she may have perhaps had Devic's disease (a subset of myelitis that results from autoimmune dysfunction). (*See* Exhibit 1 at 183-84.)  In order to protect against recurrence if she in fact did have Devic's disease, Dr. Coleman, and later neurologist Dr. James Winkley, prescribed Rituxan, a medication specifically utilized to treat Devic's disease. (*See* Exhibit 2 at 95, 99.)

Following her discharge from Central Baptist Hospital in early August 2013, Ms. Bentley was transferred to Cardinal Hill Rehabilitation where she received inpatient physical and occupational rehabilitation. (*Id.* at 98.) Despite this therapy, Ms. Bentley remained paralyzed from the waist down without control of her bladder or bowel function. She was discharged from inpatient rehabilitation on September 11, 2013.

### C.    Facts Evidencing Ms. Bentley's Knowledge: August 2013 - February 2014

On August 26, 2013, while Ms. Bentley was still admitted to Cardinal Hill Rehabilitation, her husband, plaintiff's personal injury attorney Jarrod Bentley, wrote a

letter on his law office's stationary to Paul B. Hall Regional Medical Center, addressed to "Paul B. Hall Corporate." In that letter, Plaintiff's husband indicated that he had discussed with Ms. Bentley her treatment at Paul B. Hall on July 29, 2013. (*See* Exhibit 3: Jarrod Bentley letter.) "It is with great disgust that I send this letter to you, but I think it is necessary so that you are aware of the situation, so that it never happens again in your facility." (*Id*.)

After reciting Ms. Bentley's recollection of the care she had received, Mr. Bentley summarized Ms. Bentley's dissatisfaction and attributed Ms. Bentley's current condition to the care she received at Paul B. Hall Regional Medical Center:

> It is very important that Paul B. Hall treated her very unprofessionally, they treated her like a drug addict coming in for pain medication. **If the doctor would have at least attempted to contact her primary care physician, she may not have lost the feelings in her legs, and this would have been caught must (sic) earlier.** She cannot walk now, she has to use a catheter to urinate, and she does not know when she has a bowel movement. **At Central Baptist, the Neurologist placed her on steroids of 1000mg, to keep her from losing more and more sensations.**

(*See* Exhibit 3, emphasis added.) Mr. Bentley then concluded his letter with a request that Ms. Bentley be relieved of any financial obligation for her treatment. (*See* Exhibit 3.) "She was treated very poorly at the Emergency Room of Paul B. Hall Hospital, and does not feel that she should have to pay for one penny that is billed to her." (*Id*.)

From August 2013 through February 2014, Paul B. Hall took steps to collect payment from Ms. Bentley for the services she received on July 29, 2013. (*See* Exhibit 4: Robyn Bentley, Vol. III, at 93.) Consistent with the letter written by her attorney husband, Ms.

Bentley admits that she refused to pay Paul B. Hall for any services rendered because of her dissatisfaction with how she was treated. (*Id.* at 98.)  On February 3, 2014, "patient called [Paul B. Hall] and wanted to talk to someone regarding her patient balance on her account.  She is very displeased with her service in the ED and want (sic) to file a formal complaint." (*See* Exhibit 5: DAN Notes.)  Ms. Bentley was then referred to Amy Allen, the Patient Advocate at Paul B. Hall. (*See* Exhibit 5.)

Ultimately, Ms. Bentley signed a Release of Balance on February 19, 2013. (*See* Exhibit 4 at 56; Exhibit 6: Release.)  The Release of Balance was notarized that same day by Christee Gordon, who worked with Ms. Bentley at Dan Cummins Chevrolet. (*See* Exhibit 4 at 51.)  According to Paul B. Hall's records, the Release of Balance was received by Paul B. Hall over a month later on March 21, 2014. (*See* Exhibit 5.)  For the sole consideration of a write off of Ms. Bentley's current bill, she released and discharged Paul B. Hall Regional Medical Center and its servants, successors, heirs, executors, and administrators from any and all claims, actions, causes of action, etc. arising out of the care she received on July 29, 2013 at Paul B. Hall. (*See* Exhibit 6.)

### D.    Ms. Bentley's Subsequent Medical Care

Following her discharge from Cardinal Hill Rehabilitation in early September of 2013, Ms. Bentley saw neurologist Dr. James Winkley on a regular basis. (*See* Exhibit1 at 167.)  In speaking with Dr. Winkley about more extensive physical therapy, Ms. Bentley asked him if there was anything else she could do to improve her condition. (*Id.*)  Dr. Winkley mentioned that he had some other patients who had gone to Johns Hopkins Medical Center for second opinions. (*Id.*)  Ms. Bentley was interested in this option, so Dr.

5

Winkley assisted her in making an appointment to see neurologist Dr. Carlos Pardo-Villamizar, Director of the Johns Hopkins Transverse Myelitis Center. (*Id.* at 167-169.)

On September 3, 2014, Ms. Bentley saw Dr. Pardo-Villamizar at Johns Hopkins in Baltimore, Maryland. The "only thing" that Ms. Bentley "fully remembers" from her visit with Dr. Pardo-Villamizar was that he told her that her injuries could have been prevented if she had received Prednisone sooner. (*See* Exhibit 4 at 21.)[1] Ms. Bentley posted to her Facebook account the next day the "good news" that Dr. Pardo had confirmed that she did not have an autoimmune disease (i.e., Devic's disease) and therefore, she no longer needed Rituxan therapy. (*Id.* at 22-24.)

Ms. Bentley filed her Complaint a year later on September 1, 2015.

## II.   ARGUMENT

### A.   Plaintiff failed to assert her claims within Kentucky's one-year statute of limitations for professional negligence.

Under Kentucky law, a plaintiff asserting claims for professional negligence must commence her action within one year after the cause of action "accrued." KRS 413.140(1)(a). Normally, this one-year clock begins to run when the plaintiff is injured. *Michals v. Baxter Healthcare Corp.*, 289 F. 3d 402, 406 (6th Cir. 2002)(citing *Caudill v. Arnett*, 481 S.W.2d 668, 669 (Ky. 1972)).

---

[1]Dr. Pardo-Villamizar was asked about this statement in his deposition. He did not recall making this statement to Ms. Bentley, but testified that "one thing [he] probably did express is that she had clear evidence of myelopathy and she didn't get treatment quickly." (Pardo-Villamizar at 100-101.)

Here, Ms. Bentley alleges that she was injured by the negligence of the Defendants on July 29, 2013.  On July 29, 2013, she became paralyzed from the waist down.  However, Ms. Bentley did not institute the present lawsuit until September 1, 2015, more than <u>two years</u> after her injury.

Unless the statute of limitations was tolled under an exception to the statute, then Ms. Bentley's claims against these Defendants are clearly time-barred and must be dismissed as a matter of law.

**B.     <u>The "Discovery Rule" does not toll the statute of limitations in this case to save Ms. Bentley's cause of action.</u>**

The "discovery rule," an exception to the general statute of limitations standard discussed above, tolls the statute of limitations when the plaintiff's injury "is not readily discoverable," such as in cases involving latent illness or injury resulting from exposure to harmful substances.  In those instances, Kentucky's "discovery rule" tolls the one-year accrual clock until the plaintiff "discovers, or in the exercise of reasonable diligence should have discovered" that (1) she was injured and (2) her "injury may have been caused by the defendant's conduct." *Vannoy v. Milum*, 171 S.W.3d 745, 749 (Ky. App. 2005)(citations omitted). A plaintiff discovers her injury when: 1) she has actual or constructive knowledge of her injury and who may have caused it; <u>**or**</u> 2) in the exercise of reasonable diligence should have discovered her injury and who may have caused it. *See Blanton v. Cooper Industries, Inc.*, 99 F.Supp.2d 797 (E.D. Ky. 2000).

"Injury" is a term of art in Kentucky law that has been distinguished from mere physical harm.  For the purposes of the "discovery rule," injury is defined as "the invasion

of any legally protected interest of another." *Id.* at 712.  Discovery of an injury does not, however, mean that the plaintiff must know that she has a legal cause of action. *Conway v. Huff*, 644 S.W.2d 333, 334 (Ky. 1982).  A plaintiff discovers her injury when she is simply "aware that she has been wronged by another." *Adams v. 3M Co.*, 2013 WL 3367134, *3 (E.D. Ky. 2013), citing *Conway*, 644 S.W.2d at 334.

Ms. Bentley will doubtless contend that she did not discover her injury until September 3, 2014 when she was seen by Dr. Carlos Pardo-Villamizar at Johns Hopkins Medical Center.  Ms. Bentley maintains that Dr. Pardo-Villamizar informed her that if she had received steroids earlier, then her injury may have been prevented. (*See* Exhibit 1 at 169-170.)

Plaintiff's contention is without merit.  The one-year statute of limitations began to run well before Ms. Bentley's visit with Dr. Pardo-Villamizar.  First, the discovery rule is inapplicable because Ms. Bentley suffered a readily apparent injury.  Second, Ms. Bentley had constructive knowledge of both her injury and who may have caused it well before one year prior to her initiation of this lawsuit.  Finally, Ms. Bentley was aware of sufficient facts such that exercise of <u>any</u> reasonable diligence would have allowed her to discover the cause of her injuries within the statutory limitations period.

> **1.** <u>**The "discovery rule" does not apply to causes of action when the injury to the plaintiff is apparent.**</u>

The discovery rule applies in cases when the plaintiff's injury "does not manifest itself immediately" or is not "readily discoverable" within the default one-year period. *Vannoy*, 171 S.W.3d at 749 (citations omitted); *Vandertoll v. Commonwealth*, 110 S.W.3d 789,

797 (Ky. 2003). "The principle examples are cases involving latent illness or injury caused by exposure to harmful substances." *Adams*, 2013 WL 3367134, at *2 (black lung disease which manifested after 14 years of exposure to coal dust); *Hackworth v. Hart*, 474 S.W.2d 377 (Ky. App. 1971)(negligent vasectomy not discovered until plaintiff's wife became pregnant); *Louisville Trust Co. v. Johns-Manville Prod. Corp.*, 580 S.W.2d 497 (Ky. 1979)(malignant mesothelioma manifested four years after plaintiff's last exposure to coal dust). In those cases, the one-year limitations period is deemed "unnecessarily harsh because potential plaintiffs have no way of discovering their cause of action within that year." *Id.*

To the contrary, Kentucky courts routinely hold that the discovery rule does not apply to causes of action where the injury to the plaintiff is apparent. *Vannoy*, 171 S.W.3d at 750; *Bariteau v. PNC Financial Services Group, Inc.*, 285 Fed. Appx. 218, 2008 WL 2669688 (6th Cir. 2008)("With the exception of cases involving latent injuries from exposure to harmful substances, Kentucky courts have generally refused to extend the discovery rule without statutory authority to do so."); *Louisville Trust Company v. Johns-Manville*, 580 S.W.2d 497, 501 (Ky. 1979)(tolled only "when his injury was of an inherently unknowable nature."); *Vandertoll v. Comm.*, 110 S.W.3d at 796-797 (Ky. 2003)(tolled "when the nature of their injury is such that the injury itself is not readily discoverable."); *Simmons v. South Central Skyworkers, Inc.*, 936 F.2d 268, 269, n. 2 (6th Cir. 1991)(discovery rule limited to "cases where the plaintiff has not even known of his injury until after the statute had run.").

In *Vannoy*, the Kentucky Court of Appeals held that the discovery rule did not apply because the plaintiff did not have "a latent injury that developed over time well after the

defendant's actions had taken place." *Vannoy*, 171 S.W.3d at 750. In that case, the plaintiff suffered dizziness, loss of balance, and damage to his inner ear while taking the antibiotic gentamicin, prescribed and monitored by the defendant physician, for a foot infection. *Id.* at 746. The Court of Appeals noted that the discovery rule applies to cases "when an injury does not manifest itself immediately" and held that the plaintiff's injury - - dizziness, loss of balance, and inner ear damage - - was not a "latent injury" for which the discovery rule would tolls the statute of limitations. *Id.* at 750.

Ms. Bentley's injuries were not latent; her injuries did not manifest some time after the limitations period had expired. Ms. Bentley's injury - - paraplegia with loss of bowel and bladder control - - was apparent by the end of the day on July 29, 2013. If not then, this injury was certainly apparent by the time she was discharged from Cardinal Hill Rehabilitation on September 11, 2013 with no improvement in her paraplegia or bowel and bladder control. Furthermore, her injuries were not of an "inherently unknowable nature." Rather, she certainly knew that she was paralyzed and had lost bowel and bladder control. She spent weeks in physical and occupational therapy to attempt to regain some function. This injury is not the type of latent illness or injury contemplated under the discovery rule, and for that reason, the discovery rule does not apply to toll the one-year statute of limitations.

> **2.**     **Ms. Bentley had actual or constructive knowledge of her injury sufficient to trigger the running of the statute of limitations more than one year prior to her initiation of the present action.**

When the relevant evidence is undisputed, the question of when an action for negligence accrued for purposes of determining the limitations period is a matter of law.

*Hall v. Musgrave*, 517 F.2d 1163 (6th Cir. 1975).  In considering Ms. Bentley's own testimony and other undisputed facts in this case, it is evident that Ms. Bentley had knowledge of sufficient critical facts to trigger the one-year statute of limitations by February 2014, at the very latest.

Under the discovery rule, accrual of a cause of action does not depend upon the Plaintiff's subjective discovery of the facts; rather, it is determined by whether the Plaintiff, in the exercise of "reasonable diligence," acquired knowledge of "any fact that should excite his suspicion." *Blanton v. Cooper Industries, Inc.*, 99 F. Supp. 2d 797, 802 (E.D. Ky. 2000)(applying Kentucky law).  The discovery rule stops tolling the statute once the plaintiff knows, either actually or constructively, that the "defendant **may** have caused her injury." *Adams v. 3M Co.*, 2013 WL 3367134, at *3 (emphasis added).  "Constructive knowledge, through awareness of sufficient 'critical facts' to put the plaintiff on notice, will trigger the statute of limitations period." *Adams v. 3M Co.*, 2013 WL 3367134, * 3 (E.D. Ky. 2013).

First, Ms. Bentley knew, as early as when she left Paul B. Hall's emergency room on the morning of July 29, 2013, that she believed she had been "mistreated" by Dr. Styer:

Q.     Okay. All right. And you didn't question him about MRI anything, what it is, what it's for, why can't I get one tonight.  You didn't have any conversations with [Dr. Styer] like that?

A.     Well, I realized that I wasn't going to - I wasn't being treated the way that I feel, felt that I should be treated. **If I come in there with a lot of pain and all my other symptoms with, not just pain, the tingling, the weakness, you know, feeling like it was kind of hard to move my legs, the nausea, the problems with**

11

> **voiding, that he wasn't treating me - he wasn't trying to help me.**
>
> . . .
>
> Q.    Okay. All right. Is there anything that Dr. Styer said to you from which you interpreted that he thought you were drug seeking?
>
> A.    **Other than him mistreating me.**  He seemed like he was mistreating me.  No.

(*See* Exhibit 1 at 142, 144-45.)

Second, Ms. Bentley knew that she received treatment with IV steroids at Central Baptist Hospital and that upon receiving that treatment, the progression of her symptoms ceased.

> Q.    When you got the Prednisone, could you tell whether there was any response to that?
>
> A.    I noticed that it didn't progress anymore.
>
> . . .
>
> Q.    Okay.  What I'm asking you about is at Central Baptist Hospital, when they gave you this Prednisone you said that it seemed to stop the progression and I understand that.  I'm asking, did it make anything feel better?
>
> A.    The only thing I remember is that it stopped, and it did not progress.

(*See* Exhibit 2 at 50, 51.)

Third, Ms. Bentley knew that she had been diagnosed with transverse myelitis.

> Q.    Right. And so it was a neurologist at Central Baptist that you heard, first heard the term transverse myelitis applied to you.

12

A.      Yes.

Q.      And do you know who that was?

A.      It's Doctor Coleman.

Q.      Was that before or after you received your first dose of steroids?

A.      After.

(*See* Exhibit 1 at 184.)  Furthermore, her medical records are replete with her diagnosis of transverse myelitis prior to her visit to Johns Hopkins.  For example, on November 17, 2013, Ms. Bentley hand-wrote her diagnosis of transverse myelitis on a Health History Questionnaire at the office of urologist Dr. Terrence Grimm. (*See* Exhibit 7: Health History Questionnaire; Exhibit 4 at 7-8.)  On March 25, 2014, Ms. Bentley wrote a post on Facebook about gathering medical records for her visit to Johns Hopkins Medical Center because "[t]hey have doctors that specialize in transverse myelitis." (*See* Exhibit 8: March 25, 2014 Facebook post.)  And, of course, Ms. Bentley actually saw Dr. Pardo, Director of the Johns Hopkins Transverse Myelitis Center, on September 3, 2014.  Ms. Bentley cannot reasonably claim that she did not learn of her diagnosis of transverse myelitis until her visit to Johns Hopkins, as that contention is directly refuted by her own handwriting, her own testimony, her own actions, and her own medical records.  "Such a memory lapse cannot defeat summary judgment." *Boggs v. 3M Co.*, 2012 WL 3644967, at *4 (E.D. Ky. 2012).  In other words, Ms. Bentley's calculated disagreement with herself cannot create a dispute of fact.

Finally, Ms. Bentley sought legal recourse for her perceived mistreatment at Paul B. Hall Regional Medical Center, not once, but twice in the months following her injury.

13

First, her attorney husband sent a letter to Paul B. Hall on August 26, 2013.  That letter specified that Mr. Bentley had spoken to his wife about her injury and her care at Paul B. Hall.  The avowed purpose of the letter was that "it is necessary so that you are aware of the situation, so that it never happens again in your facility." (*See* Exhibit 3.) The letter specifically detailed their understanding of the cause of Ms. Bentley's injuries.  As of August 26, 2013, the Bentleys knew that: "If the doctor would have at least attempted to contact her primary care physician, she may not have lost the feelings in her legs, and this would have been caught must (sic) earlier." (*See* Exhibit 3.)  The Bentleys further knew that: "At Central Baptist, the Neurologist placed her on steroids of 1000mg, to keep her from losing more and more sensations." (*See* Exhibit 3.)   Because of their belief that her mistreatment at Paul B. Hall had caused these injuries, Mr. Bentley wrote that Ms. Bentley "was treated very poorly at the Emergency Room of Paul B. Hall Hospital, and does not feel that she should have to pay for one penny that is billed to her." (*See* Exhibit 3.)

Ms. Bentley next pursued legal recourse against Paul B. Hall for the treatment that she received there in February 2014, when she refused to pay its bill and executed a Release of Balance. (*See* Exhibit 6.)  Ms. Bentley does not dispute that she signed the Release nor that she wanted her bill written off due to her dissatisfaction with her care. While the parties disagree as to the independent legal effect of this Release, the <u>fact</u> that Ms. Bentley was negotiating for discharge of her bill with Paul B. Hall because of her dissatisfaction with the care she received there, evidences her knowledge of her injury and her belief that the care she received at Paul B. Hall had caused those injuries.

Defendants expect that Plaintiff will contend that she did not discover the cause of her injury until she saw Dr. Pardo-Villamizar in September 2014.  However, the discovery rule does not require expert confirmation that one has been wronged to "discover" an injury and trigger the running of the statute of limitations. *Welch v. Edds*, 2005 WL 3244339 at *2 (Ky. App. 2006).  In *Welch*, the plaintiff underwent liposuction and an abdominoplasty performed by defendant Dr. Edds.  Following that surgery and a subsequent revision surgery, the plaintiff believed that her scarring was more noticeable than predicted and that her abdomen was disfigured. *Id*. at 1.  Four years after the surgical procedures, plaintiff visited another plastic surgeon who informed her that Dr. Edds' treatment had been negligent. *Id*. at 2.

The trial court granted Dr. Edds' motion for summary judgment, and the Court of Appeals affirmed the judgment, stating:

> Welch maintains that although she knew she had been harmed (i.e. disfigured) in June 1998 when she ceased to rely on Edds's treatment, she did not know she had been injured or wronged (i.e. that her legally protected interests had been invaded) until November 2002 when a doctor first told her that Edds's treatment had been negligent.  The discovery rule, however, generally does not require expert confirmation that one has been wronged.  **It requires rather that one be aware of facts sufficient to put one on notice that one's legal rights may have been invaded and by whom.**  Expert assistance may be required to apprise one of the underlying facts concerning the harm and its agent, but mere uncertainty about the legal significance of those facts does not toll the limitations period. Here, **Welch knew by June 1998 that the results of Edds's treatment were deeply dissatisfying.  Those results were sufficient to put her on notice that Edds's treatment may have been negligent, and thus were also sufficient to start the limitations period on her negligence claim.**

15

*Id.* at 2 (emphasis added).

*Welch* is factually indistinguishable from the present case and dispositive.  Ms. Bentley testified that as early as her discharge from Paul B. Hall on the morning of July 29, 2013, she was deeply dissatisfied with the care she had received.  She further knew, by July 30, 2013, that she had received steroid therapy at Central Baptist Hospital that had, in her words, stopped the progression of her symptoms.  She even took action on her deep dissatisfaction by seeking a write-off of her medical expenses from the emergency department visit.   As in *Welch*, these facts are sufficient to put Ms. Bentley on notice that Dr. Styer's treatment may have been negligent and are also sufficient to start the limitations period on her negligence claim.

If the discovery rule even applies in this case, then under Kentucky law, Ms. Bentley discovered her injury and who may have caused it as early as July 30, 2013, when she knew of her deep dissatisfaction with the care she received and of her paralysis.  Certainly, Mr. Bentley's August 26, 2013 letter to Paul B. Hall evidences Ms. Bentley's discovery of her injury and its purported cause. But at the very latest, by February 2014, she knew she had been wronged and by whom when she negotiated the release of her bill with Paul B. Hall.

### 3.   Ms. Bentley had a duty to investigate her injury to discover the identity of the tortfeasor within the statutory period.

 The discovery rule "applies only where the plaintiff has been reasonably diligent in protecting his legal rights." *Hazel v. Gen. Motors Corp.*, 83 F. 3d 422, at *3 (6th Cir. 1996), quoting *Burke v. Blair*, 349 S.W.2d 836, 838 (Ky. 1961).  "In short, potential plaintiffs cannot simply wait for someone else to connect the dots for them." *Adams*, 2013 WL 3367134, at

*3.  That is exactly what Ms. Bentley claims occurred in this case.  Despite having sufficient facts which admittedly excited her suspicion, she slept on her rights until someone else allegedly "connected the dots" for her.  This was a connection that should have been made much earlier in the exercise of reasonable diligence.

Kentucky courts have defined "reasonable diligence" as "a degree between absolute inaction and an extreme effort undertaken against apparent futility; it must be more than merely perfunctory." *Blanton v. Cooper Industries, Inc.*, 99 F. Supp. 2d 797, 802 (E.D. Ky 2000), quoting *Gray v. Sawyer*, 247 S.W.2d 496, 498 (Ky. 1952).  Ms. Bentley did nothing to investigate her cause of action.  "Taking no action whatsoever" to investigate the cause of one's injury "is - as a matter of law - failure to exercise reasonable diligence." *Id.*, citing *Blanton*, 99 F. Supp. 2d at 803 (E.D. Ky. 2000).

The U.S. District Court for the Western District of Kentucky, applying Kentucky law, noted that "[a]ny fact that should excite his suspicion is the same as actual knowledge of his entire claim . . . [and] the means of knowledge are the same thing in effect as knowledge itself." *Hazel v. General Motors Corp.*, 863 F. Supp. 435, 440 (W.D. Ky. 1994)(citations omitted).  In other words, a Plaintiff who has the means of knowledge cannot simply ignore the facts known to her and sit on her rights.

In this case, Ms. Bentley had sufficient facts to discover her injury, and she had a suspicion of the cause of her injury.  Once she knew of these facts, Kentucky law required her to investigate its cause with reasonable diligence in order to toll the statute of limitations.  Ms. Bentley simply did not meet this burden.  Since her discharge from Cardinal Hill Rehabilitation, Ms. Bentley was seen regularly by neurologist Dr. James

17

Winkley.  Ms. Bentley did not, however, ask Dr. Winkley about her dissatisfaction with the care she had received at Paul B. Hall or whether any earlier administration of steroids would have changed her outcome.  Ms. Bentley had facts, excited suspicion, and the "means of knowledge" - - a neurologist - - available to her, <u>any</u> of which under Kentucky law, is akin to having actual knowledge of her claim.

Ms. Bentley may attempt to argue that she believed that her injuries were caused wholly by her transverse myelitis, not by any negligence of her medical providers, until Dr. Pardo-Villamizar told her otherwise.  This argument is meritless.  First, Dr. Pardo-Villamizar did not tell her that any of her medical providers had rendered negligent care.  Second, as in *Welch*, expert "confirmation" of a wrong, even if Dr. Pardo had conceded his comments about earlier treatment in terms of negligence, is insufficient to trigger the discovery rule exception. (*See* Exhibit 1 at 170-172.) Third, "under Kentucky law, a plaintiff's duty to investigate with reasonable diligence does not cease simply because she erroneously, but genuinely, believes he has identified the source of his injury." *Adams*, 2013 WL 3367134 at *5.  Ms. Bentley knew that she was injured, and she knew that she had suffered an invasion of a legally-protected interest, as shown by the involvement of her attorney husband and her efforts to have her medical bill written off.  Yet she failed to act with reasonable diligence - - or any diligence at all - - to discover the purported cause of her injuries within the statutory limitations period.

## III.    <u>CONCLUSION</u>

Robyn Bentley sustained an injury - - lower extremity paralysis with loss of bowel and bladder control - - on July 29, 2013.  On that day, Ms. Bentley was extremely

dissatisfied with the care she had received from Dr. Thomas Styer at Paul B. Hall Regional Medical Center.  Ms. Bentley knew that when she received her first dose of steroid therapy in the early morning hours of July 30, 2013, her symptoms stopped progressing.  Just a few weeks later, after consultation with Ms. Bentley, her attorney husband wrote to Paul B. Hall seeking a write-off of Robyn's medical expenses, explaining that the care Robyn had received at Paul B. Hall caused her to be paralyzed and wheelchair-bound.   In the following months, Ms. Bentley continued to seek a write-off of her medical expenses, culminating in the execution of a Release of Balance wherein she negotiated a release of her medical expenses in exchange for releasing Paul B. Hall and its agents of any liability resulting from her care.

Ms. Bentley's claims against Dr. Styer and Whitaker National Corporation are time-barred.  The "discovery rule" does not toll the applicable statute of limitations because Ms. Bentley's injury was not latent and was not "readily discoverable."  She knew that she was paralyzed on July 29, 2013.  She had sufficient critical facts to discover her injury and its potential cause well before her visit to Dr. Pardo-Villamizar, when she claims the statute of limitations began to run.  Alternatively, despite having actual and constructive knowledge of her injury, Ms. Bentley failed to exercise reasonable diligence in discovering her cause of action within the statutory time period.

For the foregoing reasons, Plaintiff's Complaint is time-barred and must be dismissed as a matter of law.

Respectfully submitted,

PHILLIPS PARKER ORBERSON & ARNETT, PLC

/s/John W. Phillips

John W. Phillips
Katherine T. Watts
716 West Main Street, Suite 300
Louisville, Kentucky 40202
(502) 583-9900

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of July, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Sandra Spurgeon
Whiteford, Taylor & Preston, LLP
120 Prosperous Place, Suite 101
Lexington, KY 40509
*Counsel for Plaintiff*

Kenneth Williams, Jr.
Geoffrey D. Marsh
Williams, Hall & Latherow, LLP
1505 Carter Avenue, Suite 200
P.O. Box 2008
Ashland, KY 41105-2008
*Counsel for Terry D. Hall, D.O.*

Calvin R. Fulkerson
David A. Trevey
Fulkerson, Kinkel & Marrs, PLLC
239 N. Broadway
Lexington, KY 40507
*Counsel for Paintsville Hospital Company, LLC*
*d/b/a Paul B. Hall Regional Medical Center*

Timothy H. Napier
Victoria E. Boggs
Napier Gault Schupbach & Stevens, PLC
730 West Main Street, Suit 400
Louisville, KY 40202
*Counsel for Highlands Hospital Corporation*
*d/b/a Highlands Regional Medical Center and*
*Consolidated Health Systems, Inc. d/b/a*
*Highlands Health System*

/s/John W. Phillips
John W. Phillips