UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| ROBYN BENTLEY, | ) ) ) |
| Plaintiff, | ) )   Civil No. 15-97-ART ) |
| v. | ) ) |
| HIGHLANDS HOSPITAL CORPORATION, et al., | )   **MEMORANDUM OPINION** )   **AND ORDER** ) ) |
| Defendants. | ) |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

In baseball, ties go to the runner. In summary judgment, ties go to the plaintiff. Why? Because civil litigants have a right to a jury trial. *See* U.S. Const. amend. VII. And when a case comes down to a close call, the jury must be the one to make it. *See Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256 (1948) ("While we might be able, on the present record, to reach a conclusion that would decide the case, it might well be found later to be lacking in the thoroughness that should precede judgment of this importance and which it is the purpose of the judicial process to provide."); *Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 127 (6th Cir. 2007) (noting that close calls should be submitted to the jury); *see also Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986) (noting that courts must act with caution before granting summary judgment). Whether Robyn Bentley filed her suit in a timely fashion is one of those close calls. As such, a jury must decide it.

I.

For Robyn Bentley, it started with a sore throat. Not feeling well, Bentley went to an after-hours clinic run by Highlands Regional Medical Center ("Highlands"). There, a nurse

practitioner took a look, found redness and swelling, and sent Bentley home with a diagnosis of pharyngitis and a prescription antibiotic. R. 110 at 5–6.

Eight days later, Bentley returned to Highlands. This time, though, her symptoms were more diverse and alarming. The sore throat was gone. But when Bentley arrived mid-morning, she was already nauseated, suffering from abdominal and back pain, and having difficulty urinating. Concerned, the clinic sent Bentley to Highlands's emergency room for a CT scan. That scan revealed calcified deposits in Bentley's kidneys. The doctors diagnosed her with kidney stones, prescribed a muscle relaxant and pain medication, and sent her on her way. That was 2:00 p.m. on Sunday, July 28. *Id.* at 6; R. 352-2; R. 356-2 at 2–6 (Bentley Depo. I at 85–102).

By 1:00 a.m. the next morning, Bentley's condition had worsened. She awoke with severe pain stretching into her legs. And new to Bentley was a sensation that her legs were tingling and weakening. R. 356-2 at 7 (Bentley Depo. I at 106). An hour later, she checked into the emergency room of another hospital—Paul B. Hall Regional Medical Center ("PBH"). To PBH staff she reported two nights of back pain, difficulty walking, numbness and tingling in her legs, and difficulty urinating. R. 110 at 6; R. 352-4; R. 356-2 at 8 (Bentley Depo. I at 111–12). Bentley then met with Dr. Thomas Styer, an emergency physician working the overnight. Dr. Styer suspected that something might be amiss with Bentley's spine, so he ordered a CT scan. Because the scan came up negative for any emergent findings in Bentley's lower back, Dr. Styer determined that he could not admit Bentley for observation. He diagnosed her with acute back pain and sent her on her way—again—this time with instructions to follow up with her family doctor. That was 5:00 a.m. on Monday, July 29. R. 356-2 at 11–15 (Bentley Depo. I at 122–33, 145).

Bentley went home and tried to sleep. But rest eluded her, and by 9:30 a.m. she was in front of Dr. Blake Burchett, her family physician. By now, Bentley had begun to lose control of her left foot. Dr. Burchett examined Bentley, found her reflexes were diminished, and decided to send her to Central Baptist Hospital in Lexington, Kentucky. But before that, Dr. Burchett sent Bentley back for an MRI at the place where her ordeal had begun nine days before—Highlands. *See* R. 352-5; R. 356-2. at 15–17 (Bentley Depo. I at 147–54).

The MRI did not happen right away. For a few hours, Bentley and her parents waited at the hospital, without answers, worrying that things were getting worse. In the early afternoon, Dr. Burchett showed up for results, only to learn that the "stat" scan he had ordered still had not been done. Only after Dr. Burchett raised a bit of a fuss did Highlands staff take Bentley for her MRI. *See* R. 356-3 at 2 (Bentley Depo. II at 15); R. 356-4 at 2 (R. Adams Depo. at 54).

When the MRI was finally done, however, it had no final answers. Not because there was nothing to see; as Bentley would learn much later, there was something lurking—a worrisome shadow. Highlands's radiologist, Dr. Terry Hall, just missed it. R. 110 at 8; R. 356-2 at 21 (Bentley Depo. I at 179–80). And so, still untreated, the numbness and loss of motor control continued moving up Bentley's legs toward her abdomen. Concerned, Dr. Burchett decided that it was time for Bentley to go to Central Baptist. A few hours later, Bentley at last was on her way. R. 352-3 (Bentley Depo. II at 9–10); R. 356-3 at 6 (Bentley Depo. II at 29–30).

Bentley continued to lose control of her legs over the two hours it took her ambulance to reach Lexington. And now a new symptom appeared. Bentley began experiencing

3

shortness of breath and a sensation that her symptoms were moving up toward her diaphragm. *See id.* at 7–8 (Bentley Depo. II at 35–38).

At Central Baptist, doctors ran another MRI. This time, they found a culprit near where PBH's Dr. Styer had thought they might: While Bentley's spinal column might not have been compressed, there was significant swelling in her spinal cord. With inflammation now their target, doctors hatched a plan. In the early-morning hours of July 30, they started Bentley on intravenous steroids. *See id.* at 9–11 (Bentley Depo. II at 42–49).

By morning, Bentley's ease of breath had returned and her symptoms had stabilized. A neurologist informed her that her bout of strep throat might have triggered a flare-up of Devic's disease, a previously latent autoimmune disorder. So he ordered various tests and several days of steroids, followed by plasmapheresis. But Bentley never regained the motor control she lost before Central Baptist. She remained paralyzed from the chest down. *See id.* at 11–12 (Bentley Depo. II at 50–53); R. 356-6 at 2–3 (C. Adams Depo., 3/17/2016, at 53–56); R. 356-2 at 22 (Bentley Depo. I at 183–84); R. 356-7 (Facebook Post of Aug. 2, 2013).

Bentley left Central Baptist on August 9, 2013. Her treatment did not end there. She spent the next month in physical and occupational therapy at Cardinal Hill Rehabilitation. After that, she switched to outpatient sessions. Meanwhile, Bentley continued a Rituxan regimen under the watchful eye of a neurologist who hoped that the immunosuppressant would prevent any recurrences of spinal inflammation. R. 356-3 at 14 (Bentley Depo. II at 101–02). Still hopeful her condition might improve, Bentley even considered a trip to China for an experimental treatment. But her neurologist suggested instead a visit to Johns Hopkins Medical Center, which housed a research center dedicated to inflammatory

4

conditions of the spinal cord. *See* R. 356-2 at 18 (Bentley Depo. I at 167–68); R. 351-8 (Facebook Post).

On September 3, 2014, Bentley met with Dr. Carlos Pardo-Villamizar, the director of the Transverse Myelitis Center. On a positive note, Dr. Pardo gave Bentley the diagnosis she had been missing. Her condition was not Devic's disease, but acute inflammation brought on by the infection that had caused her sore throat a week before. That meant no more worries about recurrences and no more Rituxan. But with this good news came some bad. According to Bentley, Dr. Pardo became the first person to tell her that PBH and Highlands could have minimized—or reversed—her paralysis if only they had treated her with IV steroids earlier on July 29, 2013. R. 351-4 at 2 (Bentley Depo. I at 21–23); R. 356-2 at 19 (Bentley Depo. I at 169–70).

II.

Bentley went to court nearly one year later, on September 1, 2015. R. 1-2. She sued PBH, Dr. Styer, and Whitaker National Corporation, the company who hired Dr. Styer out to PBH. *Id.* She sued Highlands and Dr. Hall, too. *Id.* Bentley pled claims as diverse as medical negligence and violations of the Kentucky Consumer Protection Act. *See id.* at 7–21; R. 110 (first amended complaint). But all of those claims rested on a single theory: If Dr. Styer had examined her properly—and ordered an MRI or a neurological consult—while she was at PBH, or if Dr. Hall had read her MRI correctly while she was at Highlands, they would have found the inflammation and administered steroids in time to save more of her neurological function. *Id.* at 6–9.

But Bentley's medical-negligence claim might have come too late. Under Kentucky law, Bentley had to bring her claim within one year of when she knew or reasonably should

have known that she had been "injured" by the defendants. Ky. Rev. Stat. § 413.140(1)(e), (2); *Wiseman v. Alliant Hosps., Inc.*, 37 S.W.3d 709, 712 (Ky. 2000). Bentley argues that the clock started running only after her visit to Dr. Pardo, and thus that the complaint—not quite a year later—was on time. But in the defendants' view, the clock began running long before Bentley visited Dr. Pardo. As a result, the defendants each moved for summary judgment on statute-of-limitations grounds. *See* R. 351 (Whitaker and Dr. Styer); R. 352 (PBH); R. 354 (Dr. Hall); R. 356 (Highlands). Though Highlands and Dr. Hall have since settled, *see* R. 477; R. 484, the remaining defendants press on with this defense.

### III.

First, a housekeeping note. Though Bentley's amended complaint includes several claims besides medical negligence, *see* R. 110 at 13–18, neither Dr. Styer nor PBH have addressed the timeliness of these other claims. Highlands alluded to such an argument in a single footnote, *see* R.356-1 at 8 n.4, but withdrew its motion upon settlement, *see* R. 477. Even if Highlands's motion were still pending, however, one footnote does not a developed argument make. So Highlands's brief detour would not have been sufficient to present the matter for the Court's consideration at this time. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). Because the statute of limitations is an affirmative defense that the Court has no obligation to raise on its own, the timeliness of those remaining claims is not presently at issue. *See, e.g.*, *Fields v. Campbell*, 39 F. App'x 221, 223 (6th Cir. 2002).

### IV.

If a patient in Kentucky wants to sue a doctor or a hospital for "negligence or malpractice," she has only one year in which to do it. KRS § 413.140(1)(e). But as is the case in many sports, it is not just how much time you have on the clock that matters, but also

when it starts and whether you can call timeout once it does. Kentucky has decided that the countdown on medical malpractice claims should not always begin on the day the patient was treated. For if it did, many meritorious claims would never make it to court—perhaps because the patient's injury does not necessarily indicate poor treatment or because her injury remained dormant for many years. *See, e.g.*, *Imes v. Touma*, 784 F.2d 756, 758 (6th Cir. 1986); *Adams v. 3M Co.*, Civil No. 12-61-ART, 2013 WL 3367134, at *2 (E.D. Ky. July 5, 2013). If one's leg hurts as soon as she gets home from surgery, she will not likely guess that it is because of the scalpel left inside.

For such cases, Kentucky has adopted the "discovery rule" as an exception to the normal one-year statute-of-limitations period. *Tomlinson v. Siehl*, 459 S.W.2d 166, 167–68 (Ky. 1970). By statute, the clock on a plaintiff's medical-malpractice claim starts when her cause of action "accrue[s]." KRS § 413.140(1)(e). But under the discovery rule, the plaintiff's cause of action does not "accrue" until she "discovers or in the exercise of reasonable diligence should have discovered" both (1) that she was injured and (2) that her injury "*may* have been caused by the defendant's conduct." *Louisville Trust Co. v. Johns-Manville Prods. Corp.*, 580 S.W.2d 497, 501 (Ky. 1979) (emphasis added); *see also* KRS § 413.140(2); *Imes*, 784 F.2d at 758.

"Injury," meanwhile, is a term of art in Kentucky. It does not mean mere physical harm. *See Wiseman*, 37 S.W.3d at 712. Harm often follows even competent care: Doctors might do everything right even if fate takes no pity on the patient. So a bad medical outcome is not necessarily indicative of negligence. *Id*. As a result, Kentucky courts have stressed that the year does not run from a patient's "discovery of harm"—*i.e.*, awareness that she suffered a "loss of health" following medical treatment—but rather from her "discovery of

injury." *Id.* And "injury" in this context refers to the "actual wrongdoing[] or the malpractice itself." *Id.* (defining "injury" as "the invasion of any legally protected interest of another"). This does not mean that the patient needs to know that she has a legal cause of action before the clock starts running. *Conway v. Huff*, 644 S.W.2d 333, 334 (Ky. 1982). But it does mean that the limitations period will not begin until the patient knows or should know that a defendant may have wronged her—*i.e.*, negligently contributed to her bad medical outcome. *Wiseman*, 37 S.W.3d at 712; *see also Harrison v. Valentini*, 184 S.W.3d 521, 523–24 (Ky. 2005); *Adams*, 2013 WL 3367134, at *3.

Importantly, "definitive knowledge of causation is not needed"—the discovery rule stops tolling the statute once a patient knows, either actually or constructively, that the defendant "may" have caused her injury. *Adams*, 2013 WL 3367134, at *3 (citing *Johns-Manville Prods. Corp.*, 580 S.W.3d at 501). Nor does the discovery rule necessarily "require expert confirmation that one has been wronged." *Welch v. Edds*, No. 2004-CA-002255-MR, 2005 WL 3244339, *2 (Ky. Ct. App. Dec. 2, 2005); *see also Hazel v. Gen. Motors Corp.*, 863 F. Supp. 435, 438–39 (W.D. Ky. 1994). "Constructive knowledge, through awareness of sufficient 'critical facts' to put the plaintiff on notice, will trigger the statute of limitations period." *Adams*, 2013 WL 3367134, at *3. Once she encounters facts that "should excite h[er] suspicion" that a defendant negligently caused her harm, a patient effectively has actual knowledge of th[e] entire claim." *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 64 (Ky. 2010).

Finally, if a patient discovers that she has been injured, even if she does not yet have actual or constructive knowledge of who caused the injury, she "has a duty to investigate and discover the identity of the tortfeasor within the statutory time constraints." *Queensway Fin. Holdings Ltd. v. Cotton & Allen, P.S.C.*, 237 S.W.3d 141, 151 (Ky. 2007). If she fails to

8

exercise reasonable diligence in this regard, the discovery rule will not toll the statute. "In short, potential plaintiffs cannot simply wait for someone else to connect the dots for them." *Adams*, 2013 WL 3367134, at *3; *see Hazel v. Gen. Motors Corp.*, 83 F.3d 422, at *3 (6th Cir. 1996) (table); *see also Johns-Manville Prods. Corp.*, 580 S.W.2d at 501 (charging a plaintiff with knowledge of what, "in the exercise of reasonable diligence," she should have discovered); *Fluke*, 306 S.W.3d at 67 ("[I]njured parties have the duty to act diligently to investigate apparent possible causes of their injuries in order to pursue claims within the statute of limitations.").

V.

Though the discovery rule asks a fair amount of potential patients-turned-plaintiffs, at this stage it is the defendants who face an uphill climb. Kentucky has made clear that the statute of limitations "should not be lightly evaded." *Munday v. Mayfair Diagnostic Lab*, 831 S.W.2d 912, 914 (Ky. 1992). But at the same time, the statute of limitations is an affirmative defense. So it is the defendants' burden to establish that the clock expired on Bentley's malpractice claim before she filed suit. *Runkle v. Fleming*, 558 F. App'x 628, 634–35 (6th Cir. 2014) (citing *Campbell v. Grand Trunk W.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001)).

That task is all the more difficult here because the defendants raise the issue by way of summary judgment. At this stage, the Court must construe the evidence in the light most favorable to Bentley and draw *all factual inferences* in her favor. *See Liberty Life Assur. Co. of Boston v. Gilbert*, 507 F.3d 952, 957 (6th Cir. 2007). And if, at the end of the day, "the running or tolling of the statute requires the adjudication of issues of fact," the Court must deny the defendants' motions. *Coate v. Montgomery Cty.*, 234 F.3d 1267, at *2 (6th Cir.

2000) (per curiam). Summary judgment is therefore proper only if the defendants prove both that there exists "no genuine issue of material fact as to when [Bentley's] cause of action accrued" and that the limitations period has run as a matter of law. *Campbell*, 238 F.3d at 775; *see also Bray v. Husted*, 11 F. Supp. 3d 854, 855 (E.D. Ky. 2014).

## VI.

Imagine you have pain in your back and growing weakness in your legs. You visit two hospitals, but leave unhappy with your treatment. Doctors find no answers and your symptoms only worsen. Thankfully, a third hospital spots something on an MRI, starts treatment, and your symptoms stabilize. But by now you are paralyzed. And even then, the third hospital gets the diagnosis wrong, and it is a year before an expert gets it right. The expert, though, does more than that. He also tells you that, if the first two hospitals had treated you properly, your condition would not have gotten so bad. So now you know (or at least suspect) that the first two hospitals did you wrong. But the question is: Should you have realized it any sooner?

### A.

Because the defendants bear the burden of establishing that the clock expired before Bentley filed suit, *Campbell*, 238 F.3d at 775, the Court begins where they do. First up, Whitaker and Dr. Styer offer an argument that they believe short circuits all of this. In their view, Bentley cannot rely on the "discovery rule" to make her claim timely because her injury was readily apparent, not latent. R. 351 at 7–10; R. 370 at 3; *see also* R. 354 at 5; R. 373 at 2. After all, they say, Bentley knew as soon as July 29, 2013, and no later than her discharge from Cardinal Hill that September, that she was paralyzed (and maybe

permanently so). R. 351 at 10. With that knowledge, the defendants argue, Bentley's cause of action accrued. *See id.*

This argument confuses "harm" for "injury." It is undisputed that Bentley knew soon after July 29 that she was paralyzed. But Bentley's knowledge that she suffered a "loss of health" following her treatment at PBH and Highlands did not kick off the limitations period. *See Wiseman*, 37 S.W.3d at 712. After all, Bentley's medical condition—post-infectious transverse myelitis—is rare but naturally occurring. That it resulted in her paralysis does not alone indicate medical negligence: Bentley likely would have ended up that way (or worse) had she received no treatment whatsoever. The question at the heart of Bentley's suit is not whether she suffered harm, but whether the harm she suffered would have been minimized if she had received better care at the hospitals. That is the "injury" she claims. The timer on her medical-negligence claim therefore started not when she was first aware of her paralysis. Rather, the clock began on the day Bentley knew or should have known that the defendants' conduct "may have" contributed to the extent of her paralysis. *Johns-Manville Prods.*, 580 S.W.2d at 501.

B.

The way the defendants tell the story, though, Bentley knew immediately—and not just constructively—that PBH and Dr. Styer had "wronged" her. Bentley was mad from the get-go that PBH staff wrote her off as a drug-addict seeking to use "back pain" as a ticket to opiates. R. 351-1 at 7–8 (Bentley Depo. I at 144–45). She even testified that it seemed that Dr. Styer "wasn't treating" or "trying to help" her. *Id.* at 7 (Bentley Depo. I at 142). She was so frustrated with PBH that she refused to pay her bill for months. Call logs, the defendants point out, show that she contacted the hospital (or bill collectors) in October,

11

December, and the following February to say that she was "displeased with her service," that she would not pay, and that she "want[ed] to file a formal complaint." R. 351-5 at 3–5; *see also* R. 352-1 at 11–12. Nor were these efforts for naught. Bentley eventually persuaded PBH to waive her bill in exchange for a liability release. R. 351-6. Thus, they argue, Bentley knew—actually knew—that the defendants treated her wrong, in her view at least.

This argument again confuses the injury of which Bentley complains. Before, the defendants mistook Bentley's "harm" (paralysis) for her "injury" (the defendants' negligent contribution to her paralysis). Now, they take aim at an "injury" of sorts, just not the one at issue here today. They say Bentley's dissatisfaction with PBH's service was the "injury." But that is not right. Bentley does not allege mere negligent billing or a breach of a duty to not treat her rudely; hers is not a customer-service complaint of the sort that might make its way onto Yelp. Rather, she has sued for "the Defendants' collective failure to do those things necessary to ensure that [her] emergent neurological condition was treated with high doses of steroids at the earliest possible opportunity." R. 365 at 9. For the clock to start running on this medical-negligence claim, Bentley needed to have a specific awareness: She would have to have known not just that PBH had treated her poorly in a personal sense, but that it may have wronged her medically and thereby contributed to her paralysis.

Proving that type of actual, subjective awareness is a difficult thing, especially at the summary-judgment stage. To start, there is evidence cutting both ways on the nature of Bentley's dissatisfaction with PBH and Dr. Styer. Yes, Bentley has testified that she was upset during her time the hospital that Dr. Styer was not considering the full array of her symptoms. *See* R. 356-2 at 13 (Bentley Depo. I at 130–31); R. 351-1 at 7 (Bentley Depo. I at 142). From this, a jury could certainly infer that Bentley was actually aware as early as July

29, 2013, that Dr. Styer's care may have been medically deficient. But much of Bentley's apparent frustration seems to have centered instead on the hospital staff's lack of bedside manner—things like hounding her for an insurance co-pay while she was in pain, mumbling test results, and making her ask for pain meds. *See, e.g.*, R. 356-2 at 13–14 (Bentley Depo I. at 129–30, 135–36). Despite her frustration, too, Bentley says she trusted Dr. Styer was "doing the right thing"—after all, he was the doctor, not her. *See* R. 351-1 at 7 (Bentley Depo. I at 144). And finally, when Bentley contested her bill, even PBH staff treated it as a billing (not a legal) dispute. *See* R. 365-15 at 2 (J. Blankenship Depo. at 79); R. 365-16 at 2–3 (P. Major Depo. at 45–46).

But wait, say the defendants, she also signed a release, agreeing to exempt PBH from legal liability. This, they say, should answer the question definitively. According to the defendants, when she signed the release in February 2014, she decided to trade her potential claims for a zeroed-out bill. R. 370 at 8. But the parties are currently debating whether Bentley was competent to enter into the release—Bentley reports no memory of signing it because she was taking several powerful prescription medication at the time. *See* R. 441; R. 442. Even assuming Bentley knew the release's significance in February 2014, it hardly shows that she was actually aware that PBH had committed malpractice. Bentley had suffered a traumatic injury, one that will likely carry millions in continuing costs. So if she knew then that PBH had wronged her, why would she trade away any possible recovery—at a time when a suit would have been timely—for a few thousand dollars in medical bills? The opposite inference seems equally (if not more) plausible: Bentley signed the release because she did not yet know that Dr. Styer had committed malpractice.

As further support, the Defendants point to a letter that Bentley's then-husband, Jarrod, sent to PBH on August 26, 2013. *See* R. 351-3. PBH should waive Bentley's bill, Jarrod wrote, because it had treated her "very unprofessionally," as if she were just some "drug addict coming in for pain medication." *Id.* at 2. Not only that, but this poor treatment had actually harmed Bentley: "If the doctor would have at least attempted to contact her primary care physician, she may not have lost the feeling[] in her legs, and this would have been caught mu[ch] earlier." *Id.* After all, Jarrod explained, doctors at Central Baptist had managed to keep Bentley "from losing more and more sensations" by "plac[ing] her on steroids." *Id.*

Jarrod's letter is admittedly quite damaging to Bentley's cause. Bentley argues that the date on the letter is inadmissible hearsay. *See* R. 365 at 15–16. But in the letter Jarrod argues that PBH should waive Bentley's bill, so Bentley cannot reasonably argue that the letter came any later than February or March 2014, when PBH and Bentley entered into the release. That means, then, that someone who had apparently "discussed [the] matter" with Bentley had managed to sketch out her entire theory of the case many months before Bentley says she knew or should have known of it. If that same awareness were attributable to Bentley, there is no question the clock would have started on her claim long before September 2014.

But that attribution is not yet possible. Bentley has testified that she never authorized Jarrod to send the letter or even saw it until a March 2016 deposition. *See* R. 365-13 at 2–4 (Bently Depo. III at 95–97). The defendants meanwhile have not offered evidence to the contrary. Nor does the letter itself distinguish between any knowledge gained from Bentley (or her parents) and mere puffery on Jarrod's part. Bentley and Jarrod had a strained

14

relationship and had separated in February 2013. Under the terms of their separation, Jarrod was responsible for paying Bentley's medical bills. *See* R. 365-13 at 2–4 (Bentley Depo. III at 95–97). The accusations in the letter, then, might not have been a play-by-play recount of Bentley's own views, but rather a self-interested attempt by Jarrod—a personal injury lawyer—to get out of paying his estranged-wife's unexpected medical bills. Because the defendants never deposed Jarrod, it is impossible to say which statements in the letter were Bentley's and which were his alone. *See Elam v. Menzies*, 594 F.3d 463, 468–69 (6th Cir. 2010) (determining that, at summary judgment, the defendant's failure to depose a party who might have had crucial evidence bearing on the statute of limitations means the court may infer that the witness's testimony would have been unfavorable to the defense). As such, at this stage, the letter does not defeat her claims.

To this point, the defendants have not proven that Bentley was actually aware—before September 2014—that medical missteps by PBH and Dr. Styer may have caused her paralysis. Bentley has not admitted to such knowledge; she says it was Dr. Pardo who first told her. Nor does the inference necessarily arise from the present record. As such, summary judgment is not appropriate.

C.

Actual knowledge, of course, is not necessary to trigger the statute of limitations. Constructive knowledge will do the trick. *Wiseman*, 37 S.W.3d at 712. Here, the defendants say that Bentley should have at least constructively known as early as July 30, 2013, that earlier diagnosis and treatment might have limited the extent of her neurological deficits. After all, it is undisputed that Bentley believed that the steroids she eventually got at Central Baptist helped her. Once the MRI at Central Baptist showed inflammation, doctors informed

15

Bentley that they would give her intravenous steroids to relieve her symptoms. R. 356-6 at 2 (C. Adams Depo. at 56). By morning, Bentley's shortness of breath had abated. R. 383 at 5; R. 383-2 at 23–24 (Dr. DeLorenzo Depo. at 87–89). Bentley also noticed that her ascending paralysis—which had moved upward from her feet to her chest throughout the day, and which only hours before had threatened her diaphragm—had stopped progressing. R. 356-3 at 8, 11 (Bentley Depo. II at 37–38, 51). Gone, too, was the severe pain that had driven Bentley from hospital to hospital for forty-eight hours. R. 356-7 (Facebook Post, Aug. 2, 2013) ("They started me on steroids and my pain stopped and the loss of feeling stopped at my ribs."). From this, the defendants argue, a reasonable person would have wondered—and thus investigated, and thus discovered—whether PBH (or Highlands) could have stopped the progression of those same symptoms earlier on July 29.

The defendants ask more of Bentley than the Court can on summary judgment. It is possible—perhaps even probable—that a reasonable person in Bentley's shoes might have suspected that earlier steroid intervention would have stopped the progression of her symptoms. But it is not clear that a reasonable person would necessarily have connected the dots as the defendants now do. Bentley's symptoms progressed rapidly, and it appears that the loss of motor control did not start until after she left PBH. Given that, a reasonable patient might have thought the following. Perhaps Dr. Styer did not order an MRI or find anything in the CT scan or his examination because there was not yet anything to find. After all, a second hospital told Bentley several hours later that its MRI had also failed to show any abnormalities. Only much later in the night, after another MRI of a different region of her spine, did a third hospital find inflammation. But by then, Bentley's symptoms were far more advanced than they had been at PBH. For all a lay person might have known, then, the

16

third hospital found something because—with Bentley's symptoms worsening and moving upward—the inflammation had finally come into view. *See* R. 356-6 at 7 (Bentley Depo. III at 106–08).

Moreover, no doctor until Dr. Pardo ever criticized the treatment that Bentley had received at PBH or Highlands. This despite the fact that Bentley pursued her treatment and rehabilitation with diligence. *See* R. 356-2 at 18 (Bentley Depo. I at 166–68); R. 356-3 at 14 (Bentley Depo. II at 101–02). *Compare Bray*, 11 F. Supp. 3d at 858–59 (denying summary judgment under the discovery rule because, despite seeking subsequent treatment, no doctor ever told the plaintiff what might have gone wrong with her prior surgery), *with Vannoy v. Milum*, 171 S.W.3d 745, 746–51 (Ky. Ct. App. 2005) (granting summary judgment because limitations period began once doctors told patient that an antibiotic, which his doctor had prescribed, had contributed in part to his vestibular damage).

Nor was Bentley necessarily on notice that an earlier diagnosis would have allowed doctors to prevent (or minimize) her paralysis. Bentley's condition was rare, naturally occurring, and rapidly progressing. Until September 2014, doctors told her that it was a natural flare-up of a latent autoimmune disorder. This is not, then, a case where a plaintiff's medical harm was obviously indicative of negligence. *Contra Welch*, 2005 WL 3244339, at *3 (holding patient had reason to know of errors in liposuction surgery before another doctor pointed it out because the scar and contouring of her abdomen were obvious signs the surgery had gone poorly). Indeed, because Bentley's condition was worsening all on its own, she would have been paralyzed even if she had received no treatment at all. To say (as a matter of law) that Bentley should nevertheless have been aware that some portion of her paralysis might be attributable to negligence, and not just normal difficulty diagnosing a

17

rapidly evolving and rare disease, puts a heavy burden on a lay person with no medical training. Even the experts in this case cannot agree whether there is anything PBH or Highlands could have done to stop Bentley's symptoms. *See* R. 443; R. 444. And if they cannot agree, it is seems incongruous to say Bentley should have suspected it herself. *See Wiseman*, 37 S.W.3d at 712–13 ("One who possesses no medical knowledge should not be held responsible for discovering an injury based on the wrongful act of a physician."); *Harrison*, 184 S.W.3d at 524 (explaining that a patient's lack of medical expertise means he may reasonably believe that an "undesirable outcome is simply an unfortunate result of proficient medical care"); *Williams v. Altman, McClellan & Crum, P.S.C.*, Civil No. 12-131-ART, 2013 WL 28378, at *5 (E.D. Ky. Jan. 2, 2013) ("She has no medical expertise. So a jury could find it reasonable for Williams not to realize that the symptoms she experienced were the result of medical malpractice.").

Again, the defendants definitely have some strong evidence from which a jury could conclude that Bentley had constructive knowledge of the defendants' wrongs. But must a jury make that conclusion? No. As discussed above, there are sufficient inferences going the other way. Summary judgment is therefore not appropriate.

## VII.

Whether Bentley's medical-negligence claim is timely is not an easy question. The answer depends on when Bentley should have known (1) that PBH and Dr. Styer had rendered substandard care and (2) that their errors contributed to her paralysis. Bentley was immediately disappointed with the service she received at PBH, and she believed by the next day that steroids had alleviated some of her symptoms. But the record is unclear as to whether Bentley should have known before September 2014 that PBH and Dr. Styer erred in

18

not diagnosing her condition sooner and thereby contributed to her paralysis. Bentley's condition was rare. It deteriorated rapidly after she left PBH. Though steroids took the edge off her symptoms, those symptoms might have popped up only later in the day Judge thus a patient in Bentley's shoes might not have inferred that PBH should have given her steroids. Under these circumstances, a jury will have to decide whether Bentley was on notice of potential malpractice by PBH and Dr. Styer before Dr. Pardo brought it to her attention. *See Elam*, 594 F.3d at 470 ("The driving force of our decision is the summary judgment standard, which requires us to draw all reasonable inferences in favor of [the plaintiff]."); *Coate*, 234 F.3d 1267, at *2 ("If the running or tolling of the statute requires the adjudication of issues of fact, the motion should be denied." (internal quotation marks omitted)).

Accordingly, it is **ORDERED** as follows:

(1) Dr. Styer and Whitaker National Corporation's motion for summary judgment, R. 351, is **DENIED**.

(2) PBH's motion for summary judgment, R. 352, is **DENIED**.

This the 13th day of December, 2016.

Signed By:
*Amul R. Thapar* AT
United States District Judge